IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY D. EMMANOUIL,<br><br>    Plaintiff,<br><br>    v.<br><br>WEST AURORA SCHOOL DISTRICT 129,<br><br>    Defendant. | No. 18-cv-08296<br><br>Judge John F. Kness |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kimberly Emmanouil brings claims against Defendant West Aurora School District ("the School District") under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (Counts I and III) and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.* (Counts II and IV). Plaintiff served as a substitute teacher for schools in the West Aurora School District and alleges that the School District discriminated against her on the basis of her disability and age. The School District now moves for summary judgment as to all counts. For the reasons stated below, that motion is granted in part and denied in part.

**I.    BACKGROUND**

    **A.    Factual Background**

Plaintiff served a substitute teacher for West Aurora School District from approximately March 2006 through October 30, 2017, when she was discharged. (Dkt.

55 ¶ 12.) Although Plaintiff never entered into an employment contract with the School District, she would accept substitute teaching assignments on an as-needed basis at the School District's middle and high schools. (*Id.* ¶ 12–13.)

        1.        *Complaints About Plaintiff*

On September 4, 2014, the Assistant Principal of Jefferson Middle School of the West Aurora School District contacted the school administration and requested that Plaintiff be prohibited from substitute teaching at Jefferson in the future. (*Id.* ¶ 16.) Plaintiff had allegedly expressed to someone else in the school that she "hated" working at Jefferson. (*Id.*) The next day, Dr. Smith, the Assistant Superintendent for Human Resources for the School District who oversees substitute teachers, sent Plaintiff a letter stating that she could no longer accept substitute teaching assignments at Jefferson. The letter stated that she could accept assignments at other schools in the school district. (*Id.* ¶¶ 9, 19.) In the letter, Dr. Smith noted that he had received reports that Plaintiff "argued with one of the deans as he brought a student into class late" and that Plaintiff stated (1) it "wasn't [her] policy to accept late students," and (2) she did not "know what kind of place [he was] running here." (Dkt. 55-1 at 141.)

In March 2016, Dr. Smith received a report from an English teacher at Washington Middle School requesting that Plaintiff no longer teach in her classroom. (*Id.* ¶ 20.) The English teacher reported that her students "really clash with [Plaintiff]" and that they "basically begged [her] to never have [Plaintiff] again." (*Id.* ¶ 21.) On November 9, 2016, Dr. Smith received a report from a teacher at West High

School after students there reported that Plaintiff directed bilingual students to stop speaking Spanish in a bilingual class and "seemed angry" doing so. (*Id.* ¶¶ 22–24; Dkt. 55-1 at 145.) The students noted that Plaintiff "felt they were talking about her" and that it was not the first time she had behaved this way. (Dkt. 55-1 at 145.) This incident concerned Dr. Smith because it occurred the day after President Trump took office when there was heightened sensitivity around the school's diverse student population. (Dkt. 55 ¶ 24.) Dr. Smith prohibited Plaintiff from accepting substitute teaching assignments at West High School after an extensive discussion with her about the bilingual classroom incident. (*Id.* ¶ 24.)

On several occasions in 2016, Plaintiff substituted taught a class for Sarah Biewer, a teacher at Washington Middle School. (*Id.* ¶ 26.) On one such assignment, Plaintiff was teaching Biewer's last period of the day, which was a "plan period," when teachers are given time for activities like grading papers and creating lesson plans. (*Id.* ¶¶ 28–29.) Biewer received reports from her students that Plaintiff left the classroom before the period ended, leaving the students without a supervising teacher. (*Id.* ¶ 32.) Her early departure also prevented students who needed to check out school iPads for assignments from accessing them in Biewer's classroom. (*Id.* ¶ 33.)

Plaintiff served as a substitute teacher for Biewer's class again the next year, on October 16 and 17, 2017. (*Id.* ¶ 34.) Biewer reported that her students relayed several complaints about Plaintiff's behavior. (*Id.* ¶ 40.) Biewer's students complained that Plaintiff had spent significant time during the period sitting at her

3

desk, and that one student left the classroom while Plaintiff stayed seated. (*Id.* ¶ 35.) Biewer also reported that Plaintiff had changed the students' seating chart during class and that Plaintiff had complained about Biewer's lesson plan to Biewer's colleague. (*Id.* ¶¶ 36–37.) After the classes, Biewer reported Plaintiff's conduct and requested that Plaintiff no longer be allowed to accept substitute teaching assignments for her class. (*Id.* ¶ 40.) In her report to the administration, Biewer expressed her concerns that Plaintiff failed to respect the process of her classroom, did not follow Biewer's lesson plans, and created a safety issue for the students. (*Id.* ¶ 39.)

2. *Plaintiff's Disability and Discharge*

After receiving the report from Biewer, on October 25, 2017, Dr. Smith and the principal of Washington Middle School, Brett Burton, met with Plaintiff to discuss the complaints about her conduct. (*Id.* ¶ 41.) During the meeting, Plaintiff informed Dr. Smith for the first time that she suffered from neuropathy. (*Id.* ¶ 50.) Before October 25, 2017, Plaintiff had not formally disclosed her neuropathy diagnosis to any School District employee, nor had she requested an accommodation or submitted medical paperwork regarding her disability. (*Id.* ¶¶ 47, 49–51.) Plaintiff submitted a staff emergency card when she first began substitute teaching in the School District, which indicated she did not suffer from any medical conditions. (*Id.* ¶ 57.) Eventually, at Plaintiff's request, the School District allow her to use a handicapped parking spot in the parking lot. (*Id.* ¶ 54.) Plaintiff also used a cane while working as a substitute

4

teacher. (Dkt. 64 ¶ 24.) Plaintiff's neuropathy, however, did not impair her ability to work as a substitute teacher. (Dkt. 55 ¶ 52.)

On the same day of the meeting with Dr. Smith and Brett Burton, October 25, 2017, Plaintiff requested that her doctor, Dr. Langman, draft a letter to the School District reflecting that she needed accommodations at work. (*Id.* ¶ 44.) Dr. Langman sent the letter to the School District about her disability and requested accommodation. (*Id.* ¶¶ 44, 46.) The letter stated that it was Dr. Langman's "medical opinion that due to [] Plaintiff's physical, neurological and arthritic conditions her mobility is greatly limited" and that "[Plaintiff] is in need of accommodations at work to help her complete her daily job functions." (Dkt. 55-1 at 149.)

On October 30, 2017, Dr. Smith discharged Plaintiff in a letter stating: "On behalf of West Aurora School District 129, I regret to inform you that due to multiple complaints received regarding your conduct and practices as a substitute, you will no longer be permitted to fulfill any future substitute positions for the district." (*Id.* ¶ 42; Dkt. 55-1 at 147.) At the time of her discharge, Plaintiff was 57 years old. (Dkt. 1-1 ¶ 6.)

## B. Procedural Background

On November 9, 2018, Plaintiff filed a two-count Complaint in the Circuit Court of Kane County, Illinois against the School District alleging violations of the ADA and ADEA. (Dkt. 1-1.) The Complaint alleged that the School District discriminated against Plaintiff on the basis of her disability, and by failing to provide her with a reasonable accommodation; that the School District's conduct disparately

5

impacted teachers with disabilities and older teachers; and that the School District discriminated against Plaintiff on the basis of her age. (Dkt. 1-1 ¶¶ 21–25.) The School District removed the matter to this Court. (Dkt. 1.) The School District did not move to dismiss, and the parties exchanged initial discovery disclosures in February 2019. (Dkt. 20.) After discovery motion practice, the School District filed a motion for summary judgment and a corresponding Rule 56.1 statement of material facts. (Dkt. 53.) Plaintiff filed two identical opposition briefs to the motion for summary judgement as well as a Rule 56.1 statement of material facts. (*See* Dkts. 61, 64.) Against this backdrop, the Court turns to the merits of the pending summary judgment motion.

## II. STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to

6

respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

### III. DISCUSSION

Plaintiff alleges that Defendant violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et. seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et. seq.*, when it fired her.

#### A. Americans with Disabilities Act ("ADA")

Plaintiff premises her allegations of Defendant's ADA violations on disparate treatment, failure to accommodate, and disparate impact grounds.

##### 1. *Disparate Treatment*

Plaintiff first alleges that the School District discriminated against her in violation of the ADA by improperly discharging her after learning about her request for a disability accommodation. A claim for disparate treatment under the ADA survives summary judgment if the plaintiff establishes that: (1) the plaintiff was disabled; (2) the plaintiff was qualified to perform essential functions with or without a reasonable accommodation; and (3) the plaintiff's disability was the "but for" cause of adverse employment action. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).

The School District disputes only that Plaintiff's disability was the "but for" cause of her termination. (Dkt. 54 at 5.) On the question of causation in a discrimination case, the key inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or

7

other proscribed factor caused the discharge" with evidence to be considered "as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

One way to prove disparate treatment is to expose the employer's proffered reasons for the termination as pretextual. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737–38 (7th Cir. 2013). In evaluating pretext, the question is not "whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe v. Ind. Dep't of Trans.*, 871 F.3d 495, 505 (7th Cir. 2017) (cleaned up). Pretext also demands "more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Id.* (cleaned up).

Plaintiff contends that the explanation the School District gave for her termination was pretextual primarily because the timing of her discharge was suspicious. (Dkt. 61 at 4.) Plaintiff states that "while [she] cannot deny the occurrence of these disciplinary actions taken by the District over the course of her career," it was not until October 2017 that she was discharged—just after complaints about her sedentary teaching and her request for an accommodation. (*Id.*) Plaintiff does not suggest that the earlier disciplinary actions were fabricated or dishonest, but rather that her conduct was "insufficient to cause her to be removed from the District" until it related to her seating and disability issues. (*Id.*) In other words, her misconduct did not get her fired until it related to her mobility issues, soon after her request for an accommodation.

8

A suspicious timing argument alone is "generally not enough to survive summary judgment when 'reasonably, non-suspicious explanations for the timing of the termination' are otherwise proven by the record." *Cenanovic v. Hamdard Center for Health and Human Services.*, 2024 WL 1363466, at *8 (N.D. Ill. Mar. 28, 2024) (citing *McCann v. Badger Mining Corp.*, 965 F.3d 578, 592–593 (7th Cir. 2020)). Such a claim must demonstrate that the adverse employment action followed "close on the heels of protected expression," and that the person imposing the adverse action "knew of the protected conduct." *Lalvani v. Cook County.*, 269 F.3d 785, 790 (7th Cir. 2001). Generally, "close on the heels" means just a "few days." *Khungar v. Access Community Health Network*, 985 F.3d 565, 578 (7th Cir. 2021). *See Casna v. City of Loves Park*, 574 F.3d 420, 422–23, 427 (7th Cir. 2009) (a one-day time period between the employee's complaint and her supervisor's recommendation to fire her was sufficient); *McClendon v. Ind. Sugars Inc.*, 108 F.3d 789, 796–97 (7th Cir. 1997) (a two- to three-day time period between the employee's complaint and his discharge was sufficient). Plaintiff was terminated ten days after requesting her accommodation. It is undisputed that Dr. Smith was aware of Plaintiff's disability after receiving her doctor's letter but before terminating her.

The School District offers a non-suspicious explanation for its discharge of Plaintiff, citing the "multiple complaints concerning her ongoing misconduct" from various schools, and her "bad attitude and unprofessional conduct." (Dkt. 54 at 5.) It is entirely reasonable that a fourth complaint made to the administration about Plaintiff's conduct over a three-year period—after Plaintiff had already been excluded

9

from teaching at two schools within the district—prompted Plaintiff's discharge. Nor has the Court located evidence that casts doubt on the honesty of the School District's belief that her conduct was problematic, or evidence that a "similarly situated nondisabled person received more favorable treatment," for example. *See Strickland v. Village of Bolingbrook*, 2022 WL 4448741, at *9 (N.D. Ill. Sept. 23, 2022).

But considering the mere ten days between Plaintiff's request for an accommodation and her termination, it is plausible for a reasonable juror to determine that intolerance of her disability accommodation request prompted the discharge. Plaintiff testified that, in her October 25, 2017 meeting with Dr. Smith, she offered to present documentation of her disability and Dr. Smith "stopped [her] mid sentence and said, 'Do not send me any documents related to your condition. I do not want you to send any doctors' notes to me.'" (Dkt. 55-1 at 57, 94:18-95:2; Dkt. 64 ¶ 10.) The School District disputes this fact. (Dkt. 67 at 3.) If proven true, though, a fact-finder could reasonably determine this as evidence that discriminatory animus prompted Plaintiff's discharge, even if the School District's proffered reasons for firing here were also valid; contrary to the School District's contention otherwise, the ADA "permits mixed-motive claims." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019).

The remaining evidence on which Plaintiff relies to prove that she was fired because of her disability is insufficient at this stage. Plaintiff cites an email from administration at Washington Middle School to Dr. Smith and others on October 19, 2017. She asserts that this email demonstrates the driving concern with her conduct

10

was her mobility issue. The email reports that "[d]ue to several negative incidents with [Plaintiff]," the school wished to "exclude her from any further substitute positions at our building." (Dkt. 61-1 at 2.) The email then lists nine bullet points expanding on the concerns that Washington Middle School had with Plaintiff, with the first bullet point noting that Plaintiff "does not get out of her seat at all during the day, which leads to misbehavior. The kids showed me pictures that were taken of her on the iPads while she was here." (*Id.*) The email goes on to expand on eight other concerns with Plaintiff's conduct unrelated to her seating.

Plaintiff also cites Dr. Smith's testimony for evidence that her mobility issues prompted her discharge. In his deposition, Dr. Smith was asked what conduct of Plaintiff's led to her discharge. (Dkt. 55-1 at 89, 27:12.) Dr. Smith listed several concerns, including this first bullet point in the email from Washington Middle School about Plaintiff staying in her seat. (*Id.* at 28:3-4.) Plaintiff also notes that Dr. Smith testified he would "have suspicion" with someone who approached teaching by sitting down all day, in response to whether he thought it was possible for a substitute teacher to maintain control of the classroom if they were required to sit. (*Id.* at 29:15-24.)

The above evidence does not establish causation. Rather, it highlights that Plaintiff's sedentary teaching—a consequence of her disability—was one of several factors that contributed to her discharge. Evidence that an adverse employment action was taken because of *consequences* of the disability, rather than the disability itself, does not suffice. *Roberts v. City of Chi.*, 817 F.3d 561, 565–566 (7th Cir. 2016)

11

(citing *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1197 (7th Cir. 1997)) (plaintiff's low performance rating and discharge after a heart attack was not evidence of discharge because of the disability, but rather "a *consequence* of the disability.") (emphasis in original). *See also Scheidler,* 914 F.3d at 542 n.6 ("if an employer fires an employee because of unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the ADA.") (cleaned up).

But because Plaintiff's discharge came close "on the heels" of her disability disclosure and accommodation request, and because there is a dispute of material fact regarding whether Dr. Smith verbally silenced Plaintiff's documentation of her disability, the Court reserves the causation issue on the ADA disparate treatment claim for a fact-finder.

### 2. *Failure to Accommodate*

Plaintiff also brings an ADA claim for the School District's failure to accommodate Plaintiff after the School District received her request for an accommodation. A failure-to-accommodate claim is grounded in ADA language defining discrimination in part as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). A claim for failure to accommodate under the ADA requires proof that: (1) the plaintiff was a qualified individual with a disability; (2) the defendant was aware of the plaintiff's disability; and (3) the defendant failed to accommodate the plaintiff's disability reasonably. *EEOC v. AutoZone*, 809 F.3d 916, 919 (7th Cir.

12

2016). Generally, an employer is not obligated to accommodate an employee's disability until the employee informs the employer of the existence of the disability and requests an accommodation. *Guzman v. Brown County*, 884 F.3d 633, 642 (7th Cir. 2018). But after an employee notifies her employer of a disability, "an employer's liability is triggered for failure to provide accommodations." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (internal citation omitted).

As for the first prong, a plaintiff cannot state a failure to accommodate claim if "she was able to perform all essential functions of her job without regard to her physical or mental limitations." *Brumfield*, 735 F.3d at 632. Put another way, the plaintiff must require an accommodation in order to satisfy her basic job duties. The parties agree that Plaintiff's neuropathy did not "impair her ability to work" (Dkt. 55 ¶ 52), but it is contested whether Plaintiff could satisfy the essential functions of her job. Moving to the second and third prongs, Plaintiff argues that Dr. Smith was aware of Plaintiff's neuropathy after the October 25, 2017 meeting but neglected his obligation to engage in an interactive process to determine a reasonable accommodation. (Dkt. 1 at 8.) *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 807 (7th Cir. 2005) (noting an employer's duty to work with employee to "craft a reasonable accommodation"); *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786–787 (7th Cir. 2016) (employer must do more than "s[i]t on its hands" when employee requests accommodation).

In response, the School District relies on *Guzman v. Brown County* for the proposition that "[a]fter the fact requests for accommodation do not excuse past

13

misconduct." 884 F.3d at 642 (*citing Tate v. Ancell*, 551 F. App'x 877, 886 (7th Cir. 2014)). Both *Guzman* and *Tate* are, however, distinguishable. The employees in those cases did not raise their requests for accommodation until during or just after disciplinary meetings for their alleged misconduct. *Guzman* and *Tate* explained that the accommodation requests could not immunize the employees from disciplinary action the employer had already decided to impose. *See Guzman*, 884 F.3d at 642 (evidence established that plaintiff was terminated based on "repeated late arrivals," the last of which occurred before notifying her employer of her disability and requesting accommodation); *Tate*, 551 F. App'x at 886 (plaintiff requested accommodation during disciplinary hearing for falling asleep on the job). Further, in *Guzman* and *Tate*, the evidence indicated that the employers terminated the plaintiffs because of workplace misconduct rather than because of disability. In *Guzman*, the employer did not even learn of the disability until after plaintiff's termination. In *Tate*, the record contained evidence that the employer similarly disciplined other employees who had committed the same misconduct as plaintiff.

The facts here are sequentially, and thus consequentially, different. Plaintiff notified her employer of her disability and requested an accommodation ten days *before* her termination. If she had requested her accommodation after or during her termination, *Guzman* and *Tate* would control. Instead, the timing of Plaintiff's termination more closely resembles the facts in *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d at 1061. In *Spurling*, the plaintiff notified her employer of her narcolepsy diagnosis after she was found asleep on the job several times. 739 F.3d at 1059. After

14

receiving her request for an accommodation, the employer "chose to turn a blind eye and terminate her." *Id.* at 1061. The Seventh Circuit found that the employer should have engaged in an interactive process to find a reasonable accommodation. *Id.*

It is true that Plaintiff's accommodation request cannot immunize her from disciplinary action for her misconduct. But based on the record, the Court cannot affirmatively say the School District would have terminated Plaintiff had she not raised her disability issue and requested an accommodation. Perhaps Dr. Smith already planned to terminate Plaintiff prior to the October 25, 2017 meeting—meaning, before Plaintiff's request for an accommodation—but that is for a reasonable juror to determine. Viewing the facts in the light most favorable to Plaintiff, it is plausible that Dr. Smith decided to terminate Plaintiff only after she raised the disability issue. If so, Dr. Smith failed to reasonably accommodate Plaintiff.

### 3. *Disparate Impact*

Disparate impact claims under the ADA "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52, (2003) (cleaned up). For a disparate impact claim of discrimination, a plaintiff must establish that a particular employment practice causes a disparate impact on a member of a protected class. *Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 717 (7th Cir. 2012) (citing 42 U.S.C. § 2000e–2(k)). Plaintiff must identify "the specific employment practice," *id.*, and establish

15

causation by offering "statistical correlation evidence demonstrating that a specified employment practice of the defendant has a disproportionately negative effect on members of the plaintiff's protected class." *Noreuil v. Peabody Coal Co.,* 96 F.3d 254, 258 (7th Cir. 1996). *See also Adams v. City of Indianapolis, Ind.*, 742 F.3d 720, 733 (7th Cir. 2014) (requiring plaintiff to demonstrate "statistically significant disparity" between disabled and non-disabled applications).

Plaintiff strains to argue that a specific policy existed within the School District that caused a disparate impact on teachers with disabilities. She points to Dr. Smith's deposition testimony to suggest that Dr. Smith viewed sedentary teachers with "suspicion." (Dkt. 61 at 7.) But the suspicion Dr. Smith noted in his deposition concerned whether a sedentary teacher could maintain control of the classroom. Regardless, one remark in a deposition is a far cry from establishing a specific employment policy.

Plaintiff also alleges a policy of "forc[ing] teachers to stand and move about the classroom upon pain of discipline or termination" seemingly out of thin air. (*Id*. at 7–8.) This general allegation does not identify a specific employment practice. *See Puffer*, 675 F.3d at 717 (not enough to "point to a generalized policy" that leads to a disparate impact). Even were such a policy to exist, Plaintiff offers no evidence that the policy falls more heavily on teachers with disabilities. Plaintiff instead asserts that the policy "will inevitably fall" most heavily on those with disabilities. (Dkt. 61 at 8.) Such a conjectural disparate impact claim, as unmoored from record evidence as it is, cannot withstand summary judgment.

### B. Age Discrimination in Employment Act ("ADEA")

Plaintiff premises her allegations of Defendant's ADEA violations on disparate treatment and disparate impact grounds.

#### 1. *Disparate Treatment*

Plaintiff did not respond to the School District's arguments on the ADEA disparate treatment claim in her opposition to the School District's motion for summary judgement. Wholesale failure to respond to an opposing argument results in waiver. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *C & N Corp. v. Kane*, 756 F.3d 1024, 1026 (7th Cir. 2014) (a nonmovant's failure to make an argument in response to a summary judgment motion constituted a waiver of that argument); *see also McKeown v. Sears Roebuck & Co.*, 355 F. Supp. 2d 917, 939 (W.D. Wis. 2004) (plaintiff waived claims by failing to respond to challenges to claim in opposition to summary judgment brief).

Even if Plaintiff had not waived this claim, the Court would still grant summary judgment. Plaintiff offered no evidence, nor did the Court locate any in the record, that suggests the School District terminated her because of her age.

#### 2. *Disparate Impact*

Plaintiff also brings a disparate impact ADEA claim against the School District. As the Supreme Court has held, disparate impact claims are, in addition to age-based disparate treatment claims, cognizable under the ADEA. *See Smith v. City of Jackson*, 544 U.S. 228, 240, (2005). As with disparate impact claims brought under the ADA, plaintiffs must demonstrate "statistical evidence of a significant age-based

17

disparity and must also isolate and identify the specific employment practice that she contends is responsible for that disparity." *Filipek v. Oakton Community College*, 312 F. Supp. 3d 693, 703 (N.D. Ill. Feb. 27, 2018) (citing *Smith*, 544 U.S. at 241).

Plaintiff contends that, by disciplining teachers for sitting during instruction, and "cultivating a culture where sitting in the classroom was viewed as . . . lacking discipline," the School District enacted a policy of "restricting the ability of teachers to sit during instruction." (Dkt. 61 at 11.) Because older people are more likely to suffer from mobility issues, the policy "will inevitably fall most heavily" on those over 40, Plaintiff's argument goes. (*Id.*)

Plaintiff fails to establish evidence that a specific policy existed and evidence that such a policy had a greater impact on older teachers. This claim thus fails for the same reasons that Plaintiff's ADA disparate impact claim fails.

### C. Plaintiff's Rule 56.1 Statement

The School District requests that the Court strike Plaintiff's Rule 56.1 statement of additional facts because it fails to comply with Local Rule 56.1. (Dkt. 66 at 2.) Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The rule is intended "to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted). Local Rule 56.1(a) requires the moving party

to provide "a statement of material facts" as to which the moving party contends there is no genuine issue for trial. L.R. 56.1(a); Fed. R. Civ. P. 56(c)(1).

As the Seventh Circuit has emphasized, compliance with Local Rule 56.1 is important, and when a responding party fails to controvert the moving party's statement of facts in accordance with the rule, Rule 56.1's enforcement provision provides that those facts shall be deemed admitted. *See* N.D. ILL. L.R. 56.1(b); *see also Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Although a district court is permitted to require strict compliance with the Rule, it is within the court's discretion to determine how strictly to apply its own rules. *Traum v. Equitable Life Assurance Soc'y of the U.S.*, 240 F. Supp. 2d 776, 780 (N.D. Ill. 2002) (citing *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)).

Much of Plaintiff's statement of facts includes improper legal conclusions and statements instead of additional facts. But the Court, in its discretion, did not wholesale strike Plaintiff's statement of fact in this opinion. Instead, it considered only those facts—few and far between as they may be—it deemed material.

## IV. CONCLUSION

For the reasons stated above, the Court grants in part and denies in part the School District's motion for summary judgment. Summary judgment as to Plaintiff's ADA disparate treatment claim and ADA failure to accommodate claim in Count I is denied. Summary judgment as to Plaintiff's ADA disparate impact claim in Count I and her ADEA claims in Count II is granted.

SO ORDERED in No. 18-cv-08296.

Date: September 30, 2024

                                                                               JOHN F. KNESS
United States District Judge